McPHERSON *v.* BLAIR.

5-499 273 S. W. 2d 852

Opinion delivered November 22, 1954.

[Rehearing denied January 17, 1955.]

*Virgil Roach Moncrief* and *John W. Moncrief,* for appellant.

*Arthur R. Macom* and *W. L. Leach,* for appellee.

GRIFFIN SMITH, Chief Justice. A strip of land half a mile east-west comprising 5.35 acres was the original subject of primary controversy.

C. F. McPherson owns the southwest quarter of section 13, etc., in Arkansas county, and A. H. Blair owns the northwest quarter. McPherson invoked the court's ejectment process and procured a jury's verdict, coupled with a finding that the true line was the one established by T. J. Strode in 1950.

McPherson purchased the southwest quarter in 1938 at a time when the land had been fenced on the north for more than 35 years. Blair acquired the northwest quarter in 1941. Each, prior to his purchase, had tenanted the property about which the boundary controversy centers and was therefore familiar with the conditions that prevailed.

In 1943 Blair observed that certain fences were not in alignment, indicating that the government surveys had not been followed. In calling McPherson's attention to these irregularities Blair suggested that a survey be made, and it is his contention that McPherson consented. Shortly thereafter an appointment was made with a surveyor named Hilliard, who with the two proprietors measured half a mile north from a designated position. They then returned to the starting point and surveyed east an equal distance and then turned north, "but the quarter line was not run across." An iron pipe was driven at the northwest corner of section 13. "Then," said the witness, "we put a stake on the east end and an iron pipe to sight over the dump in order to get the fence—in order to get on the right line."

Blair says that while the survey was being made McPherson called his attention to a triangular area embracing a few acres east and north of a drainage ditch. The ditch had been constructed in a northwest-southeast course through Blair's land and across the southwest quarter, clipping a corner of McPherson's holding in a way that access to it was difficult. This cutoff area will be discussed later.

Digressing momentarily from Hilliard's survey, attention is directed to the testimony of appellant's first witness, County Surveyor Strode. His qualifications, as developed by counsel for McPherson, included services with the U. S. Engineers in the Vicksburg and Memphis districts, but since 1931 he had been with the Little Rock area and had also done work for the Forestry Service.

In 1948 Strode was asked by McPherson to ascertain the true line between the northwest and southwest quarters. Another survey was made in 1950 and the plat was introduced. This varied from the Hilliard survey, but ran south of the old fence row—a line abandoned in December, 1947, when Blair caused the old fence to be removed and reconstructed in substantial reliance upon the Hilliard survey. The 1950 survey, identified on the plat as the true line, was almost equidistant from the old fence on the north and the new fence to the south, and it conforms to established east-west lines dividing other properties, with perhaps an infinitesimal discrepancy at the west end.

McPherson contended for the north line and Blair for the southern. The jury accepted the center line as charted by Strode.

The circuit clerk and recorder testified from official records that the deed under which Blair acquired the land contended for described the grant as all of the fractional northwest quarter, . . . containing 177.79 acres more or less. . . . "Present recognized boundary lines are accepted as enclosing all the lands intended to be conveyed by this instrument."

It is Blair's contention that when the 1943 survey was made McPherson recognized that the old fence was farther north than it should be. To correct this error and at the same time project a program of mutual convenience, it was, said Blair agreed that he might utilize McPherson's triangular plot north and east of the ditch and that McPherson should cultivate to the fence along the northern boundary of the southwest quarter west of the ditch. In addition to the convenience attained by

each proprietor, it is claimed that the isolated triangle was deteriorating because of coffee beans.

The testimony is in irreconcilable conflict regarding the agreement Blair says was reached. McPherson admits he was with Blair at least a part of the time when the 1943 survey was made. He named three others who were in the party, and emphatically disclaims an agreement respecting use of land to the old fence, and says he was without power to prevent the survey.

As might be expected when a long period has intervened between conversations had at a time no one anticipated a controversy and maturity of the dispute, McPherson did not remember many of the details. His one point of certainty was that he did not agree that the old fence was not the true line, nor did he thereafter cultivate the disputed strip south of the old fence with the understanding that Blair was to utilize the triangle on an exchange-of-use basis.

In July, 1947, McPherson wrote from his home in Searcy, complaining that rent on the triangle had not been paid for three years, "and you are hereby notified to stop farming said land." Blair replied August 4th, expressing great surprise; for, said he, "We made an agreement about three years ago . . . that I would not move my fence over 117 feet on to the line, but [would] . . . allow you to farm that small strip of my land, and in return I would farm the four acres [you refer to"]. He then added: "Since you choose to terminate that agreement there is nothing for me to do but move the fence over 117 feet on the line, which I shall proceed to do in the near future."

Through an attorney McPherson replied, denying there had been any agreement except the one pertaining to the triangle, and that arrangement was declared terminated "after your crops for the year are harvested, and not later than January 1, 1948."

In a letter directed to the attorney Blair replied that he did not care to enter into litigation, "but I do not in-

tend to stand by and be imposed upon in such manner. This land was surveyed by agreement and both Mr. McPherson and I were present. Mr. McPherson has [several] acres across a ditch from his main tract that are accessible to me, but not to him. At the time the survey was made I proposed to move the partition fence . . . back on the line established by the surveyor. Mr. McPherson wanted to deed me his few acres across the ditch in exchange for my land lying beyond the fence and being farmed by him. [Since] this was not agreeable, he then suggested that for the time being he would farm my land between the present fence and the line as established by the surveyor, and that I might farm his land across the ditch. Neither was to owe or pay the other rents, and at a later date the fence was to be moved, or some adjustment made between us as to the land.''

There were other letters, but in substance the contentions were similar to those here set out.

The verdict was: ''We the jury find for the plaintiff, and find that the division line should be the true line as established by Surveyor Strode in his 1950 survey.'' Judgment was rendered on this verdict over McPherson's protest that as to possession of the land the jury had found all issues in his favor. Damages contended for were not mentioned, hence there is a presumption of disallowance.

Certainly, in the absence of agreements Blair claims to have made with McPherson, the old fence that took in part of the northwest quarter would be the true line. Its use for more than a quarter of a century would imply acquiescence. But Blair's testimony that an understanding was reached in 1943 is substantial. Irrespective of other evidence it could be accepted or rejected by the jury. Appellant, while conceding that in ordinary ejectment the burden is on a plaintiff to establish his title, thinks the rule is not applicable to a case where the defendant wrongfully seizes the plaintiff's property. Whether seizure was wrongful would depend upon the 1943 agreement, for at that time—if Blair's testimony

be true—McPherson's right to the land was directly challenged and he was permitted to cultivate the strip only because the triangle became available to Blair.

It is next argued that the jury, in finding for McPherson by express language, necessarily held that he had not recognized Blair's claim under the Hilliard survey and that the agreement relating to cultivation was not made. The jury did not recognize either claim as a whole, but chose to accept the more central line established by Strode. This denied to Blair anything north of the Hilliard survey and south of Strode's 1950 projection, and it denied to McPherson anything north of the Strode line and south of the old fence. It has long been held that one of the privileges allowed a jury is that of inconsistency.

Inasmuch as McPherson won part of what he was contending for it is not necessary to determine whether the verdict was general, special, or general and special. See Ark. Stat's, § 27-1741.3. (Section 27-1741, Civil Code § 30, was specifically repealed by Act 336 of 1953.)

Appellant thinks the court erred in refusing to give his requested instruction No. 5. This instruction would have told the jury that if adjoining landowners acquiesced in a division fence for 35 years, "there is a presumption of law that such a division fence and line is an agreed division line, though the fence is not on the true line." While this is a correct statement of law as far as it goes, by its incompleteness it would have been calculated to confuse or mislead the jury. Merely to tell a jury of laymen that a presumption of law exists could not be helpful in this case. For the instruction to have been complete it should have told the jury that the presumption was entitled to such weight as the jury might see fit to attach to it and that the presumption was not conclusive and might be rebutted by evidence in the case.

Affirmed.

Mr. Justice McFaddin dissents in part.

ED. F. McFADDIN, Justice, dissenting. The appellant claimed to the north line on either of two grounds: (a) adverse possession to the north line; or (b) agreed boundary to the north line. I think the appellant was entitled to have his theory of "agreed boundary" submitted to the Jury. The Trial Court, by refusing appellant's Instruction No. 5, entirely eliminated that issue from the case although a considerable portion of the testimony had been directed toward the matter of "agreed boundary".

In the oral argument in this Court, the only objection that appellee's counsel urged against appellant's Instruction No. 5 was that the appellant was not entitled to assert "agreed boundary" as an alternative to adverse possession. I think he was; and the majority of this Court evidently so thought because the majority in justifying the refusal of the Trial Court to give the Instruction No. 5 uses this language:

"While this is a correct statement of law as far as it goes, by its incompleteness it would have been calculated to confuse or mislead the jury. Merely to tell a jury of laymen that a presumption of law exists could not be helpful in this case. For the instruction to have been complete it should have told the jury that the presumption was entitled to such weight as the jury might see fit to attach to it and that the presumption was not conclusive and might be rebutted by evidence in the case."

I do not see the vice in the Instruction No. 5 that the majority urges; and the appellee did not claim that the instruction was indefinite. The Instruction No. 5 says in full:

"If adjoining land owners, either by themselves or through their tenants and agents, acquiesce in and govern themselves by a division fence for thirty-five years, there is a presumption of law that such a division fence and line is an agreed division line, though the fence is not on the true line."

In *Deidrich* v. *Simmons*, 75 Ark. 400, 87 S. W. 649, Justice McCULLOCH, speaking for this Court, used this language:

"The proprietors of adjacent lands may by parol agreement establish an arbitrary division line, or an agreement may be inferred from long-continued acquiescence and occupation according to such line, and they will be bound thereby."

In *Gregory* v. *Jones*, 212 Ark. 443, 206 S. W. 2d 18, in discussing an agreed boundary case, we used this language:

"It is true that in this case the original rail fence line was established without a prior dispute as to boundary; but the recognition of that line for the many intervening years (34 in this case) shows a quietude and acquiescence for so many years that the law will presume an agreement concerning the boundary."

As I see it, appellant's Instruction No. 5 is couched in the language of the opinions of this Court as taken from the quotations above; and should have been given. The appellant's claim of "agreed boundary" was not covered by any other instruction; and thus the Trial Court, by refusing the Instruction No. 5, deprived the appellant of a Jury decision on a vital issue in the case. My dissent goes only to the refusal of this Instruction.